**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                      Case No. 07-CR-56

CHRISTOPHER DARON HICKS,

        Defendant.

---

## ORDER

On March 6, 2007, a grand jury sitting in the Eastern District of Wisconsin returned a two-count indictment against defendant Christopher Daron Hicks ("Hicks") charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and with possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871. (Docket #1). At his arraignment, Hicks pleaded not guilty to both counts. (Docket #4). On March 27, 2007, Hicks filed a motion to suppress physical evidence of the firearms, arguing that the firearms were seized during an illegal warrantless search of Hicks's residence. After conducting an evidentiary hearing, Magistrate Judge William E. Callahan, Jr. issued a recommendation that Hicks's motion be denied. On June 1, 2007, this court adopted Magistrate Callahan's recommendation and denied Hicks's motion to suppress. On June 15, 2007, Hicks entered into a plea agreement with the government, and later pleaded guilty to both counts in the indictment, at the same time reserving his right to appeal the denial of the motions to suppress. (Docket ##'s 24, 27). On October

18, 2007, the court sentenced Hicks to two concurrent terms of thirty seven months in prison, to be followed by three years of supervised release. (Docket #31). Hicks appealed the court's decision denying his motion to suppress.[1]

On August 20, 2008, the Seventh Circuit vacated the court's order denying Hicks's motion to suppress and remanded the case for further consideration. *See United States v. Hicks*, 539 F.3d 566 (7th Cir. 2008). On remand, the court referred the case to Magistrate Callahan for further fact finding and to make a recommendation on the disposition of Hicks's motion in light of the Seventh Circuit's directive. (Docket #39). After conducting another evidentiary hearing, Magistrate Callahan issued a recommendation that Hicks's motion be denied. Hicks has objected to that recommendation. The court will now review Magistrate Callahan's recommendation together with Hicks's objections.

## BACKGROUND

Before addressing the magistrate's new recommendation, the court reviews the facts not in dispute on remand. On appeal, the Seventh Circuit succinctly outlined these underlying facts:

> Detective Wayne Armon of the Milwaukee Police Department was conducting an investigation of a shooting that occurred on October 11, 2006. On December 24, 2006, Armon asked Detective Donald Brown to go to Hicks's flat at 944B North 37th Street, Milwaukee, Wisconsin and instructed Brown to get consent to search. According to Brown, Armon told him there was enough to get a warrant, but Brown himself did not have knowledge of any facts that would establish

---

[1] In the plea agreement, Hicks reserved the right to appeal the court's decision denying his motion to suppress.

-2-

probable cause. In addition to a suspected connection to the October 11 incident, there were two municipal warrants for Hicks's arrest. After establishing that Hicks's residence was the upper rear flat of the duplex, Brown and other officers went up and knocked. Hicks answered and was immediately handcuffed and placed under arrest. The officers conducted a protective sweep and discovered Hicks's girlfriend, Samella Smith, and four children, all of whom had been asleep. Smith, upon request, got clothes for Hicks who was in the kitchen, and then Smith and the children were told to wait in the living/dining area. During all of this, Hicks was upset and vocal, asking why the police were there and so on. After getting dressed, Hicks was removed from the residence and taken out to the squad car. At some point relatively soon thereafter, he was taken downtown to the police station.

After Hicks's removal, Detective Brown sought consent to search from Smith. Smith resisted, telling Brown that the police should get a warrant. Brown continued talking with her and at some point in the conversation, Brown told her that he could obtain a search warrant, but that it could take some time. He told her it was Christmas Eve and that with her cooperation he would not destroy her house in the search. He also told her he believed there were guns in the residence with children in the home. Smith told Brown to "go ahead." Nevertheless, she refused to sign a consent statement in his memo book. In the search, officers found, in Smith and Hicks's bedroom, a loaded Smith and Wesson, .40 caliber, semi-automatic handgun, additional ammunition, and a loaded sawed-off Mossberg .12 gauge shotgun, with a pistol grip.

*Hicks*, 539 F.3d at 567-68.

After Magistrate Callahan issued his first recommendation on Hicks's motion, Hicks objected, arguing that the search of his residence was invalid because police used coercive tactics and false threats to gain Smith's consent to search the residence. Hicks also argued that the arrest warrants issued against him were invalid, and that police improperly entered the curtilage of his residence. The court overruled Hicks's objections and adopted the magistrate's recommendation. The court found that Smith had authority to consent to the search, that she had in fact

consented, and that Hicks's removal from the residence by police prior to the search did not invalidate that consent. The court also found that Brown's threats to obtain a search warrant did not vitiate Smith's consent:

> Brown was acting upon information from fellow detective Armon, and Brown was aware that Hicks was the subject of an on-going investigation, and that it was Armon's information and belief that there were guns located at the residence. That said, the court does not conclude that there actually was probable cause to obtain a warrant; the court only determines that Brown appeared to be acting upon a legitimate belief that a search warrant could be obtained. When law enforcement officials' expressed intention to obtain a warrant is genuine, and not merely a pretext to induce submission, it does not vitiate consent.

(Order, June 1, 2007, 16, Docket #22) (internal citations omitted). The court further rejected Hicks's objections relating to the curtilage of his residence and the validity of the arrest warrants, finding them to be without merit. (Order, June 1, 2007, Docket #22).

In vacating the court's decision, the Seventh Circuit found error in the court's view of the law with respect to Brown's threat to obtain a warrant. *See Hicks,* 539 F.3d at 571. The Seventh Circuit stated that "it was error to evaluate whether the stated intention [of Brown] to get a warrant was genuine or pretextual without considering whether the police actually had the underlying probable cause for the search." *Id.*

Because the record before the court was insufficient to make an appropriate reassessment in light of the Seventh Circuit's decision, the court ordered the assigned magistrate to make additional findings of fact and issue a new

-4-

recommendation on Hicks's motion. On December 18, 2008, Magistrate Callahan held an evidentiary hearing to take testimony from Armon, the detective who instructed Brown to get consent to search Hicks's residence.

Armon was the lead detective investigating the October 11, 2006 shooting of Kimberly Dudley ("Dudley"). (Transcript of Evidentiary Hearing, December 18, 2008, (hereinafter "Tr.") 4-5, Docket #45). Dudley was shot during what could be described as a neighborhood brawl. The brawl stemmed from the criminal trial of Gary Anderson ("Anderson"), in Milwaukee County Circuit Court, for the murder of Sidney Smith ("Smith"). (Tr. 6). Armon stated that during the trial, spectators supporting Smith clashed with those supporting Anderson. (Tr. 10). After a jury found Anderson guilty, Anderson's supporters confronted Smith's supporters in front of the home of a woman known as Rabbit. (Tr. 7-10, 21). Dudley was standing among a group of Smith's supporters, on Rabbit's porch, when shots were fired. (Tr. 22).

Armon testified that officers believed a 0.9 millimeter firearm with an extended magazine clip was used in Dudley's shooting. (Tr. 25). In support of this conclusion, Armon cited the fact that police had recovered multiple 0.9 millimeter shell casings at the scene, and that witnesses of the shooting reported rapid gunfire consistent with an extended clip.[2] (Tr. 83). According to Armon, witness statements led police to compile a list of seven possible suspects who were identified as supporters of

---

[2] The court also notes that Armon equivocated when asked whether witnesses of the shooting actually saw the 0.9 millimeter firearm used, at once stating that witnesses never reported seeing the extended clip and later claiming witnesses had seen it. (Tr. 26).

-5-

Anderson, though some of the suspects were only known by their street names. (Tr. 7-11). Police initially arrested Kelsey Williams at the scene, but he denied any involvement in the shooting. (Tr. 11).

After "some time," police arrested another suspect, Marcus Finch ("Finch"). (Tr. 12). Finch admitted to his involvement in the shooting. Finch told police that, after the verdict was read in Anderson's trial, he, along with Kelsey Williams, Brandon Williams ("Brandon"), and a man named Colby, went to Brandon's house to arm themselves, and later proceeded to Rabbit's house.[3] (Tr. 12-13). Finch also recalled seeing a man he knew only as C-Dub at Brandon's house, but saw C-Dub leave after Brandon told him to "get the chopper." (Tr. 13, 15). Armon understood "the chopper" to be a slang term used for a semiautomatic firearm. (Tr. 14). Brandon later admitted to police that he instructed C-Dub to "get the chopper," and that he had seen C-Dub with the 0.9 millimeter firearm at some point prior to the date of the shooting. (Tr. 83-85). Finch also told police that he saw C-Dub in a car within a block of Rabbit's house around the time the brawl erupted. (Tr. 15).

Armon further testified that he interviewed several other witnesses, including Frankie Randall ("Randall"). (Tr. 20). Randall, who was Rabbit's nephew, claimed he was hanging around his aunt's house when the melee broke out. (Tr. 22). Randall said he saw Brandon and Kelsey Williams, Marcus Finch, Colby, and Jerrell Starks approach Rabbit's house before the shooting. (Tr. 22). Randall also reported

---

[3]Finch admitted to police that he went to Rabbit's house armed with a 0.32 caliber revolver. Police later recovered that weapon where Finch told police he had dropped it after the shooting. (Tr. 16-17). Armon testified that police did not identify any 0.32 caliber shell casings at the scene of the shooting. (Tr. 17-18).

-6-

seeing a car that he believed belonged to C-Dub near the scene, and that he later heard from others in his neighborhood that C-Dub, along with another man known as Nephew, were the shooters. (Tr. 23). Randall also told police that at one point prior to the shooting, his friend considered buying the 0.9 millimeter firearm from Nephew. (Tr. 26, 54).

Armon claimed that an informant later identified C-Dub as Hicks, and Nephew as Jermaine Stevens ("Stevens"). (Tr. 26, 29-31). Armon also received information from Finch, Randall and three other witnesses in the neighborhood that led police to believe the 0.9 millimeter firearm was at one of three locations: Hicks's house, his parents' house or Stevens's house. (Tr. 25-30). Based on information from the informant, police ruled out Hicks's parents house as a possible location for the gun, and focused only on the homes of Hicks and Stevens. (Tr. 60). This informant, who Armon claimed was close to Hicks, also directed police to the Hicks's and Stevens's residences, and told police that the gun they were looking for was at one of those locations. (Tr. 30-31, 60, 70). Police set up surveillance of Hicks's house, and saw Hicks coming and going. (Tr. 30-31,33).

Armon decided to attempt to arrest both Hicks and Stevens on or about December 24, 2006, for their suspected involvement in Dudley's shooting. (Tr. 31-32, 65, 68). Armon hoped to gain consent to enter both of their residences and search for the 0.9 millimeter firearm. (Tr. 65-66). Before going forward with Hicks's arrest, Armon claimed that he consulted with the Milwaukee County District Attorney's Office. (Tr. 32). However, Armon did not attempt to obtain either a

-7-

criminal complaint against Hicks or a warrant to search his house. (Tr. 31-32). Armon testified that, at the time of Hicks's arrest, he believed police had probable cause to arrest Hicks and to search Hicks's home based on the information available. (Tr. 33).

Armon put Detective Brown in charge of the operation to arrest Hicks and to search his residence. (Tr. 35). Armon briefed Brown on the information he had received from his interviews with witnesses. (Tr. 68). Armon testified that he told Brown that he should arrest Hicks, and seek consent to search his residence for a 0.9 millimeter firearm with an extended clip. (Tr. 66). Armon also told Brown to let him know if Hicks did not let police into the home so that Armon could apply for a search warrant through the Milwaukee County District Attorney's Office. (Tr. 35-36).

## ANALYSIS

The court now reviews *de novo* the portions of Magistrate Callahan's recommendation to which Hicks objects. *See* 28 U.S.C. § 636(b)(1)(B); *United States v. Jaramillo*, 714 F. Supp. 323, 328 (N.D. Ill. 1989) (stating the court is to conduct a *de novo* review of the recommendation where objections are made). As a result of the Seventh Circuit's decision in this case, the court's task on remand is to first determine whether police had a reasonable factual basis to believe probable cause existed at the time Officer Brown threatened to obtain a search warrant. Then, the court will reassess whether Officer Brown's expressed intention to obtain a warrant was genuine or pretextual. *See Hicks*, 539 F.3d at 572 n.1.

-8-

Magistrate Callahan recommended that Hicks's motion to suppress be denied, finding that Detective Armon had a reasonable factual basis to believe that probable cause existed to search Hicks's residence based on information he had received from various sources. Accordingly, Magistrate Callahan found that Armon genuinely believed he had sufficient information to obtain a search warrant at the time he sent Brown to search Hicks's residence. Hicks makes three objections to that recommendation: (1) that the informant Armon used was unreliable; (2) that information received by Armon about a neighborhood rumor tied to unknown sources was unreliable for purposes of gaining probable cause; and (3) that the information received by Armon regarding the location of the 0.9 millimeter firearm was stale by the time police searched Hicks's residence.

In general, warrantless searches are permissible under the Fourth Amendment if police receive voluntary consent from a person with authority to give such consent. *See United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992). However, "baseless threats to obtain a search warrant may render consent involuntary." *Id.* Police threats to obtain a search warrant do not render subsequent consent involuntary if police could have established probable cause had they sought a warrant. *See United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992). Probable cause exists where the totality of the circumstances would lead a reasonable person to believe that a search will turn up evidence of a crime. *See United States v. Brack*, 188 F.3d 748, 755 (7th Cir. 1999) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). In considering the totality of the circumstances, the court looks to the

credibility of informants used, the "nexus to the searched premises and to illegal activity, and the age of the information" police have obtained. *United States v. Wiley*, 475 F.3d 908, 915 (7th Cir. 2007). Probable cause requires "a probability or substantial chance" that evidence of a crime will be found in a search, but does not require an absolute certainty. *United States v. Sidwell*, 440 F.3d 865 (7th Cir. 2006); *see id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

Armon's conclusion that Hicks likely had the 0.9 millimeter firearm in his residence was based in part on information from an unnamed informant. When considering the use of an informant to establish probable cause, the court looks to four factors:

> (1) the extent to which the police have corroborated the informant's statements; (2) the degree to which the informant has acquired knowledge of the events through firsthand observation; (3) the amount of detail provided; and (4) the interval between the date of the events and police officer's application for the search warrant.

*Wiley*, 475 F.3d at 915 (quoting *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002).

Hicks argues that information gained from the informant was unreliable and insufficient to create a probability that the firearm was in Hicks's residence. Armon testified that an informant told him in December of 2006 that either Hicks or Stevens likely had the 0.9 millimeter gun in his residence. Armon believed the informant was a close acquaintance of Hicks and Stevens. In his objection, Hicks claims that the informant's exact relationship with Stevens and Hicks was never revealed, and that

-10-

the information provided lacked specificity as to where the gun was in the residence, or when the informant saw it in the residence.

The court finds that Armon's informant provided sufficiently reliable information to increase the overall probability that the 0.9 millimeter firearm would be found in Hicks's residence during a search. The informant's claims were corroborated in part by Brandon Williams's previous statements that Hicks was in possession of that firearm in the past. Randall also provided partial corroboration by revealing that his friend had considered buying that exact firearm from Stevens at one point. The informant also correctly identified Hicks and Stevens by their street names, C-Dub and Nephew, and was able to direct police to their residences. Given his apparent close relationship with both Hicks and Stevens, the informant also could be considered to have firsthand knowledge of what was in their residences. The fact that Armon did not reveal the informant's specific relationship to the two men is not dispositive since doing so would presumably reveal the informant's identity. While the court agrees with the magistrate's finding that Armon's informant did not provide exact details of where the gun was actually stored or when the gun was placed there, the information provided was not so vague as to make it unreliable. Finally, the informant provided his information to Armon the same month that Armon sent Brown to arrest Hicks and attempt to search Hicks's residence. Therefore, the informant's information was not likely to have been stale.

While the informant appears to have been the only source of information linking the 0.9 millimeter gun to Hicks's residence in December of 2006, this was by

no means the only source of information from which Armon could have reasonably concluded that probable cause existed. Armon had collected information from various sources over more than two months of investigating the Dudley shooting. Two suspects in the shooting, Finch and Brandon Williams, told police that Hicks had been instructed to retrieve what was understood by Brandon Williams to be the 0.9 millimeter extended clip firearm immediately prior to the shooting. Witness reports of rapid fire during the shooting and the shell casings recovered at the scene tended to show that the same firearm was used in Dudley's shooting. Finch also told police that he saw Hicks in his car near the scene of the shooting. Randall told police that he too had seen Hicks's car near the scene of the shooting.

Hicks next argues that a neighborhood rumor, which Randall reported to police, should not be considered by the court as a reasonable factual basis to believe probable cause existed. Randall reported to police that he heard from unnamed persons in the neighborhood that Hicks and Stevens were the perpetrators of the Dudley shooting. Hicks also claims that information received by police from three other unnamed witnesses should not be considered. Those three witnesses provided information that helped police narrow the likely location of the 0.9 millimeter firearm to either Hicks's parents' house, Hicks's house or Stevens's house. The government argues that Hicks mischaracterizes the record because Armon's testimony demonstrates that he did not rely on neighborhood rumors alone to form his belief that probable cause existed. The court agrees. While probable cause cannot rest solely on common rumors or reports, *see United States v. Sharpe*, 470

-12-

U.S. 675, 717 (1985), Armon had much more to rely on than Randall's rumors. As the court noted above, Randall had seen Hicks's vehicle at the time of the shooting, and was familiar with the specific 0.9 millimeter firearm police suspected was used in the shooting. And the information provided by the three unnamed witnesses Armon cited, to the extent it could even be considered rumor, was corroborated by Finch and Randall. Therefore, the court finds that police did not rely on mere rumors in forming their belief as to whether probable cause existed to search Hicks's residence.

Finally, Hicks argues that much of the information provided to police, including statements from Brandon Williams, Finch and Randall, was stale by the time Armon ordered Brown to arrest Hicks and to search his residence. Hicks notes that Armon obtained information connecting Hicks to the 0.9 millimeter extended clip firearm around the time of the shooting on October 11, 2006, but did not attempt to search Hicks's residence until December 24, 2006. Hicks also asserts that no witness definitively placed the 0.9 millimeter firearm in Hicks's residence at the time of the search. The court agrees with the magistrate's assessment that the information Armon had at the time of the search was not so stale as to make Armon's belief that probable cause existed unreasonable. Dudley's shooting occurred over two months before Brown and other officers searched Hicks's residence. However, the information provided by the informant in December of 2006 was the linchpin in Armon's investigation, linking Hicks's and Stevens's residences to the gun. Initially, police only had information that persons going by the names C-Dub and Nephew

-13-

may have been the perpetrators of the shooting. The informant was able to confirm that the C-Dub and Nephew were actually Hicks and Stevens, and to direct police to the two residences where the informant believed the 0.9 millimeter extended clip firearm would be found. What is more, Armon had no information of changed circumstances that would have rendered the informant's information stale at the time of the search. No doubt Armon did not know to a certainty that a search of Hicks's residence on December 24, 2006, would turn up "the chopper," but certainty was not required. *See United States v. Grubbs*, 547 U.S. 90, 95-96 (2006). In the end, police found the firearm they were looking for during the simultaneous search of Stevens's residence. (Tr. 73-75).

Based on the totality of the circumstances, the court finds that Detective Armon had a reasonable factual basis to conclude that probable cause existed at the time he directed Brown to arrest Hicks and to seek consent to search Hicks's residence. Moreover, the court finds that Armon had probable cause to believe that evidence of the 0.9 millimeter firearm would be found in either Hicks's residence or Stevens's residence. At the time of the search, Armon had information from multiple sources connecting Hicks to the scene of Dudley's shooting and to the gun police suspected was used in that shooting. Armon also had information, from a sufficiently reliable informant and from Randall, linking the same gun to Hicks's residence and to Stevens and his residence. The court further finds Brown's stated intention to obtain a warrant if Smith did not consent to a search to be genuine rather than pretextual. Armon briefed Brown on his investigation, and told Brown to contact him

if consent could not be obtained so that Armon could apply for a search warrant. Having previously found that Smith's consent to search Hicks's residence was otherwise authorized and voluntary, the court now concludes that Smith's consent was not vitiated by any baseless police threat to obtain a search warrant. Therefore, Hicks has failed to demonstrate a Fourth Amendment violation, and the court is obliged to deny Hicks's motion to suppress the physical evidence obtained during the search of his residence.

Accordingly,

**IT IS ORDERED** that the defendant's objection to Magistrate Callahan's recommendation (Docket #53) be and the same is hereby **OVERRULED**;

**IT IS FURTHER ORDERED** that the February 24, 2009 recommendation from Magistrate Callahan that the defendant's motion to suppress physical evidence be denied (Docket #52) be and the same is hereby **ADOPTED**; and

**IT IS FURTHER ORDERED** that defendant's motion to suppress physical evidence seized during a search of his residence (Docket #7) be and the same is hereby **DENIED**;

Dated at Milwaukee, Wisconsin, this 24th day of April, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge